**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

RICHARD E. BELL, JR. and
KAREN K. BELL, Individually and as Guardians
of the Property of BRIAN E. BELL,
BRANDEN R. BELL and BRIAN E. BELL,

              Plaintiffs,

                                      CIVIL ACTION
                                      NO.  7:16-cv-16

vs.

FREDERIC A. ROSEN AND
JOHNSON PUBLISHING COMPANY,
LLC  a/k/a JOHNSON PUBLISHING, INC.,

              Defendants.

## **COMPLAINT**

    NOW COME RICHARD E. BELL, JR. and KAREN K. BELL, Individually and

as Guardians of the Property of BRIAN E. BELL, BRANDEN R. BELL and

BRIAN E. BELL, Plaintiffs in the above-captioned case, and, within the time

permitted by O.C.G.A. §9-2-61, state their re-filed Complaint against

Defendants, FREDERIC A. ROSEN and JOHNSON PUBLISHING COMPANY, LLC

a/k/a JOHNSON PUBLISHING, INC., Defendants, as follows:

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiffs, RICHARD E. BELL, JR., (hereinafter "RICK BELL") and KAREN K. BELL ("hereinafter "KAREN BELL"), Individually and as the natural parents and Guardians of the Property of BRIAN E. BELL, BRANDEN R. BELL (hereinafter "BRANDEN BELL") and BRIAN E. BELL (hereinafter "BRIAN BELL") [1], bring this renewal action following their September 23, 2015 dismissal without prejudice of the original action transferred to this Court against the above-named Plaintiffs in the case, styled RICHARD E. BELL, JR. and KAREN K. BELL, Individually and as Guardians of the Property of BRIAN E. BELL and BRANDEN R. BELL v. FREDERIC A. ROSEN AND JOHNSON PUBLISHING COMPANY, LLC a/k/a JOHNSON PUBLISHING, INC, 7:15-cv-00179-WLS. All Plaintiffs are residents of St. Johns County, Florida, except BRANDEN BELL, who is a resident of Valdosta, Lowndes County, Georgia.

2.

Defendant, JOHNSON PUBLISHING COMPANY, LLC a/k/a JOHNSON PUBLISHING, INC. (hereinafter "JPC"), is a Delaware limited liability

---

[1] When this action was originally filed in August of 2014, BRIAN BELL, born June 3, 1997, was a minor. Thus the original action was brought by his parents, RICK and KAREN BELL, as his guardians. The action was dismissed on September 23, 2015 under the Georgia renewal statute, O.C.G.A. §9-2-61, utilizing the same caption. The original caption has thus been retained in this renewal action. Since BRIAN BELL is now an adult, he has also been named as an adult in the caption to make sure that the re-filed action is brought in the name of the proper party. Subsequent pleadings need no longer reference his parents as guardians.

company with its principal place of business at 200 S. Michigan Avenue, 21

FLR, Chicago, Illinois 60604. JPC can be served through its registered agent

for service of process, The Corporation Trust Company, Corporation Trust

Center, 1209 Orange Street, Wilmington, Delaware  19801. JPC has two

members, Johnson Holding Company, Inc., a Delaware corporation with its

principal place of business at 200 S. Michigan Avenue, 21 FLR, Chicago,

Illinois 60604, and SIG Holdings, Inc, an Illinois corporation with its principal

place of business at Chase Tower, 10 S. Dearborn Street, Chicago, IL 60603.

3.

Defendant, FREDERIC A. ROSEN (hereinafter "ROSEN"), is a resident

of the state of New York and may be served at his resident address, 125 S.

Manor Avenue, Kingston, NY 12301.

4.

This Court possesses subject matter jurisdiction over this claim

pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship

between Plaintiffs and Defendants and the amount in controversy exceeds

the sum of $75,000.00, exclusive of interest and costs.

5.

This Court has personal jurisdiction over Defendants under the Georgia

Long-Arm statute, O.C.G.A. 9-10-91(3). JPC and ROSEN committed tortious

injuries in this state caused by acts or omissions outside this state, and JPC

derives substantial revenue from subscriptions and sales of Ebony Magazine

-3-

and other publications in Georgia. ROSEN likewise benefits from JPC's sales of Ebony Magazine in Georgia in that, on information and belief, JPC paid Rosen for the Kendrick Johnson Articles defined in paragraph 7 below. Rosen also benefited as a "true crime writer" from the Kendrick Johnson Articles concerning alleged crimes in Georgia. Moreover, ROSEN and JPC worked with a private investigator and other persons present in Georgia to gain background for the defamatory statements in the Kendrick Johnson articles which pertained to an alleged murder and other criminal activities in Georgia.

6.

Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that JPC derives substantial revenue from subscriptions and sales of Ebony Magazine and other publications in the Middle District of Georgia, including the Valdosta Division, and Plaintiffs suffered substantial harm from Defendants' conduct in this district. ROSEN is subject to venue in this district since he also published the defamatory statements in this matter for profit in this district.

## FACTUAL ALLEGATIONS

7.

Between August 12, 2013 and April 9, 2014, JPC published a series of fifteen articles in Ebony Magazine, available on its internet site, www.ebony.com, about the death of Kendrick Johnson (hereinafter the

"Kendrick Johnson Articles").  Twelve of these articles were written by
ROSEN, who has published a number of books in the "true crime" genre.
Though all of the fifteen Ebony articles must be read together as a
developing story, ten articles by Rosen, attached hereto and made a part
hereof as part of Exhibit "A," explain the essential background and context of
the libelous statements.  Virtually all of the libelous statements, except the
cover-up conspiracy allegations, were made in two of the articles described
below.

8.

        The Kendrick Johnson Articles asserted that Kendrick Johnson, a
Sophomore at Lowndes County High School (hereinafter "LCHS"), was
murdered by blunt force trauma and placed in a standing gym mat in the old
gym at LCHS between third and fourth blocks, shortly after 1:30 PM, on
January 10, 2013. The "Who Killed Kendrick Johnson" title of the initial five
Ebony articles, dated between August 12 and September 23, 2013 (Exhibit
A, pp. 2, 6, 13, 18 and 23), as well as the body of the articles, state that
Kendrick Johnson was "murdered" or "killed" (Exhibit A, pp. 15, 22, 30).

9.

        ROSEN's claim of murder is based upon his explanation of "suspicious
circumstances" (Exhibit A, p.26) surrounding the investigation of Kendrick
Johnson's death. Initially, the false claim is made that "his face had been
beaten beyond recognition," (Exhibit A, pp. 2). In the September 23, 2013

-5-

article, Defendants refined their theory to state that Kendrick Johnson "died from one powerful blow - inflicted by one person while others likely held him down." (Exhibit A, p.23).

10.

In the November 19, 2013 article entitled "Tweets From Possible Suspects Raise Eyebrows" (hereinafter the "Tweets" article), ROSEN stated that a white sophomore LCHS high school football player, fictitiously named Chris Martin, as well as his older brother, fictitiously named Clark Martin (a LCHS senior), sent taunting or threatening tweets after the murder (Ex. A, pp. 39,41,43). Then, employing fictitious interviews of them by Lowndes County Sheriff (hereinafter "LCS") detectives (Exhibit A, pp. 40-41, 22, 35-36), ROSEN falsely that they were possible suspects in the LCS investigation of Kendrick Johnson's death (Exhibit A, pp. 39-43).

11.

ROSEN also falsely suggested in Tweets that Chris Martin's motive to murder Kendrick Johnson was due to two previous "fights" they had (Exhibit A, p.40; described in earlier articles, Exhibit A, pp. 22, 37, 40-14) that were not revealed by either Martin during their fictitious LCS interviews (Exhibit A., pp. 22 and 41), resulting in a "prior animus" going back at least two years (Id.). In fact, there was only one scuffle on a junior varsity bus going to a football game, and the boys had been friends since childhood.

12.

ROSEN falsely suggested that the "Martin brothers" may have committed a racially-motivated murder in the October 25, 2013 article, entitled "Did a Fight Lead to Kendrick Johnson's Murder" by the following language: "Did the Martin brothers hold a grudge? Did they in some way lure Johnson into a trap at the old gym? And who delivered the final blow? If the motive was racial, then it's up to Michael J. Moore, the U.S. Attorney for the Middle District of Georgia, to investigate and bring charges.  It is a Federal crime to harm a person because of their race…"  (Exhibit A, pp. 34-37).

13.

ROSEN admitted in the Kendrick Johnson Articles that he was using pseudonyms to describe the Martin family members (Exhibit A, pp. 22, 38). The true identities of three of the Plaintiffs in this case were revealed in Tweets just after the statement that the father of the "Martin brothers", fictitiously named Sam Martin, refused initially to allow LCS detectives to interview his sons: "We have been able to confirm that the elder Martin is an FBI agent." (Exhibit A, pp. 40-41).  This fact, coupled with the ROSEN's statement that "Chris Martin" was a member of the LCHS varsity football team (Exhibit A, p. 42), unquestionably identified Chris, Clark and Sam Martin as BRIAN BELL, BRANDEN BELL and RICK BELL, to the many LCHS students, teachers and coaches who knew them and Kendrick Johnson.

14.

BRIAN BELL was threatened with bodily harm and ostracized by many

LCHS students after the Tweets article. Such threats from various sources

have continued on social media, particularly Twitter, since that time, and

have been exacerbated by the national news coverage of Kendrick Johnson's

death and alleged murder suggested in the Kendrick Johnson Articles.

15.

On April 9, 2014, ROSEN, reinvented his version of Kendrick Johnson's

death yet again in a new Ebony article, "Are We Closer to Answers?"

("Answers"). Based upon a January 27, 2014 anonymous e-mail to LCS,

ROSEN claimed that "Chris Martin" (i.e., BRIAN BELL), with the help of

another unnamed classmate, murdered Kendrick Johnson between third and

fourth block classes at LCHS on January 10, 2013, out of jealous rage after

learning that Kendrick Johnson had had sexual intercourse with his

girlfriend: "The young lady [BRIAN BELL's girlfriend] [stated] that she, 'had

sexual intercourse with Kendrick Johnson [the teammate who he fought,

who] found out and threatened Kendrick Johnson.  KJ told [him] to meet him

in the old gym after third block and he would have his knife ready.'"

"Another student, a friend of Kendrick Johnson's alleged romantic rival, was

also reported to be there. The result? Kendrick Johnson being killed and

stuffed in a gym mat." (Exhibit A, pp. 49-50). These defamatory statements

by Defendants had no basis in fact whatsoever, as is explained in further

detail below.

16.

In early 2013, following an autopsy by the Georgia Bureau of Investigation (hereinafter the "GBI"), and a thorough investigation by the LCS, Kendrick Johnson's death was ruled the result of accidental positional asphyxia after he became trapped in a standing gym mat while trying to retrieve a pair of tennis shoes in the old gym at LCHS.

17.

The statements in the Kendrick Johnson Articles that Kendrick Johnson was murdered by "blunt force trauma" (Exhibit A, pp. 2, 18, 23, 25 and 31) are false and without any basis in fact or reliable and unbiased expert opinion.

18.

The Kendrick Johnson Articles state and suggest a factual basis for a complex conspiracy to cover up the alleged murder of Kendrick Johnson involving numerous personnel in the LCS, the Lowndes County Board of Education, the GBI, and the Valdosta Crime Lab, as well as the Bell Plaintiffs. In the September 23, 2013, Part 5 of the "Who Killed Kenneth Johnson" articles, ROSEN explained that the failure of law enforcement to find out why Kendrick Johnson dies was leading to a possible federal investigation of Kendrick Johnson's death (Exhibit A, pp. 26-27). ROSEN pointed out that the U.S. Attorney for the Middle District of Georgia, Michael Moore, had the

duty look into "civil rights and state/local corruption cases… and that Moore

"could open a full-scale investigation into Kendrick Johnson's murder and

enforce civil rights violations.  Or, he can charge those he deems responsible

with violations of the Racketeer Influenced and Corrupt Organizations Act

(RICO) (Exhibit A, p.27)(emphasis added).  In his October 31, 2013 Ebony

article entitled "US Attorney opens investigation into Kendrick Johnson's

death" [not attached as Exhibit A but referred to in subsequent attached

articles (Exhibit A, pp. 47-48, 49)], ROSEN announced Moore's decision to

open such an investigation.

19.

In a November 9. 2013 Ebony article entitled "Questions Arise from

the new Footage of Kendrick Johnson" (not a part of Exhibit A), JPC stated

the repeated complaint of the Kendrick Johnson family lawyers about the

"roadblocks they [had] encountered' in the Kendrick Johnson death

investigation, this time involving allegations of 'suspicious edits, blurry

images and no time or date lines' on the LCHS surveillance camera footage

showing Kendrick Johnson entering the old gym on the day he died.  The

Kendrick Johnson attorneys state that 'the case is starting to look like a

**cover up**'"(emphasis in the original).

20.

In the January 17, 2014 article entitled "Will a County Sheriff Face

Charges?  As the FBI and US Attorney's office investigate the 17-year-old's

-10-

death, questions about a possible cover up persist," (Exhibit A, p. 44) (emphasis added), ROSEN cited possible "Obstruction of Justice" charges against Lowndes County Sheriff Prine due to alleged irregularities in the Kendrick Johnson death investigation, implying Defendants' adoption of the alleged conspiracy to cover-up Kendrick Johnson's murder.  (Exhibit A, pp. 47-48).

21.

Defendants' cover-up theory only works if the far-fetched conspiracy described above existed, which necessarily involved RICK BELL and his wife, KAREN BELL (fictitiously named Susan Martin in the articles)(Exhibit A, p. 41).  This conspiracy theory is based upon false allegations in the Kendrick Johnson Articles of a botched investigation by LCS and other allegedly suspicious circumstances that are not in fact suspicious, including the following:

a. That the Lowndes Coroner was not notified until five or more hours after the body was discovered (Exhibit A, pp. 2, 47). This delay resulted from the time necessary for the LCS to complete work at the crime scene before the body could be examined, and the Coroner agreed with the GBI autopsy finding that Kendrick Johnson died from accidental positional asphyxia;

b. The false claim that the body was moved from the gym and the crime scene was compromised before the coroner arrived (Exhibit

-11-

A, pp. 46-47);

c.  The false claim that no crime scene photographs were taken
    (Exhibit A, pp. 2-3);

d.  The false claim that the body was contaminated by opening the
    body bag prior to autopsy.  Though the bag was opened to permit
    family identification of KJ, the body was not contaminated;

e.  That KJ's organs and clothes were lost after the autopsy, destroying
    evidence of a possible homicide (Exhibit A, pp. 32-33). The organs
    and clothes were thoroughly examined and discussed in the GBI
    autopsy and tissue slides preserved; available clothing items were
    returned to KJ's family;

f.  The false claim that KJ's cell phone was missing, which might have
    had fingerprints of the murderer (Exhibit A, p. 7);

g.  The fact the autopsy report was not released for approximately
    three and-a-half months after KJ's death (Exhibit A, p. 7). The
    autopsy findings were properly delayed until the exhaustive LCS
    investigation was completed and closed;

h.  That KJ's shoulders were too wide for him to fit into the mat
    (Exhibit A, p.30). When reaching into the mat for his shoes, KJ's
    shoulders would not have been square with mat opening;

i.  The false claim that the GBI issued conflicting explanations of what
    KJ was doing when he died, "reading" into the mat instead of

"reaching" into the mat (Exhibit A, pp. 11, 25). This was an obvious misspelling in an e-mail from a GBI official to the Lowndes County Coroner when the autopsy results were released;

j.  The false claim that the LCS should have, but did not, launch a prompt homicide investigation (Exhibit A, pp. 24, 33);

k.  The false claim that the LCS obtained a statement given by Chris Martin (i.e., BRIAN BELL), but it was withheld from the LCS report: " According to the police narrative, Chris then gave a statement that not included in the police files that we [ROSEN and JOHNSON] obtained" (Exhibit A, p. 42).  There was no statement by Brian Bell in the LCS file for the simple reason that neither he nor his brother Branden were ever interviewed by the LCS since they were never suspects in the investigation of KJ's death.

l.  After consulting with KJ's family and their private investigator (Exhibit A, pp. 26-27, 31-32, 37-38), U.S. Attorney Moore re-opened the investigation into KJ's death as a racially-motivated murder complicated by possible "state/local corruption" (Exhibit A, pp. 26-27) in late October of 2013; however, this grand jury investigation has not resulted in any murder indictments;

m. The false claim the GBI refused to even look at the report of the pathologist hired by lawyers for the KJ family that suggested KJ was murdered and raised questions about the validity of the GBI

autopsy of January 14, 2013 (Exhibit A, p. 26);

n. The private investigator hired by KJ's family in February 2013, Beau Webster, was quoted by ROSEN as saying: "I have investigated a lot of murder cases, but none like this. I have never had a situation where I didn't get any cooperation from anyone" (Exhibit A, p, 30). However, the two Valdosta civil rights leaders who thoroughly investigated KJ's death for the local chapter of the Southern Christian Leadership Conference (hereinafter "SCLC") have denied any lack of cooperation of local authorities, believe KJ died by accident, and described the continuing claim of a cover-up to be a "witch hunt" (April 11, 2014 report to US Attorney Moore from Leigh Touchton; April 3, 2014 report to US Attorney Moore from Floyd Rose; Exhibit "C" hereto).

22.

More importantly, regardless of how KJ died, the claim in the Kendrick Johnson Articles that BRIAN BELL, assisted by BRANDEN BELL or any other LCHS student, could have played any part in Kendrick Johnson's death in the LCHS gym is completely untrue.

23.

No effort was made by Defendants to verify the alibis of the BELL brothers. BRANDEN BELL was in route to a LCHS wrestling match in Macon, Georgia at the time of Kendrick Johnson's death. BRIAN was in class at

LCHS, or walking to class, and never entered the LCHS old gym at all on January 10, 2013, as has been verified by witnesses and LCHS video surveillance camera footage.

24.

The Answers article was based upon a January 27, 2014 anonymous e-mail to LCS that had been thoroughly discredited by reports of LCS interviews with the sender and other persons mentioned in the e-mail that were released by LCS with the e-mail well before the Answers article. The author of the e-mail recanted her story in a Valdosta Daily Times article published on March 27, 2014. In fact, BRIAN BELL had no girlfriend at the time of Kendrick Johnson's death, and the girlfriend he began dating later in 2013 had no personal relationship at all with Kendrick Johnson, much less a sexual relationship, at any time.

25.

As previously stated, the Kendrick Johnson Articles are replete with false and misstated facts from fictitious LCS interviews allegedly proving motive and opportunity for the BELL brothers to have murdered Kendrick Johnson. The un-redacted LCS investigative file, available under the Georgia Open Records Act, O.C.G.A. §50-18-71, et seq., was released to media sources and others prior to the Tweets article in November 2013. These factual misstatements are more particularly set forth in the demand letter of Plaintiffs' Counsel to Defendants, Exhibit "B" hereto.

26.

Prior to and during publication of the Kendrick Johnson Articles,
ROSEN has made a number of public appearances in the media describing
and commenting upon the defamatory content of the articles and
embellishing them. One such lengthy interview took place on January 30,
2014 on the Dan Zupanzky Blog Radio show and contains defamatory
statements quoted in part as follows:

> The GBI, which is notoriously corrupt… they do a preventive
> investigation they send a detective to interview two boys, one is 17
> and one is 18, the dad is an FBI Agent … in charge of the Southwest
> Gang Task Force (this positively identifies Rick Bell, who held that
> position),… and the individual they send out to do [these
> interviews] was part of the Gang Task Force, never declares there
> is any conflict of interest, interviews the father, interviews the two
> boys, and it turns out that one of these two boys has had two fights
> with Kendrick Johnson, the only individual who they have come up
> with who has motive….I'm hoping to write this piece for Ebony.com
> which is this…I have discovered the motive, the means and the
> opportunity for one of these two boys that I mentioned earlier
> whose Daddy is an FBI agent to have killed Kendrick
> Johnson…Further, I have information that has come to me about
> why Kendrick Johnson walked into that gym, on January 10[th], was

he lured in there by somebody.

...

...Dr. Anderson did a dissection of the neck, he discovered that Kendrick Johnson dies from one blow to the neck or it could have been pressure from a wrestling hold. You remember the two kids I mentioned earlier whose Daddy was an FBI agent? Guess what, they are both wrestlers. And one of them is a brilliant football player. These are very strong capable kids.

In this one media appearance, ROSEN emphatically accuses BRIAN and BRANDEN BELL of the murder of Kendrick Johnson, says that the GBI interviewed RICK BELL, BRIAN and BRANDEN BELL (a pure fiction), and suggests a conspiracy to cover up the murder due the corruptness of the GBI and the relationship of RICK BELL with his law enforcement colleagues. All of these statements about the BELLS' felonious conduct are slander per se under O.C.G.A. 51-5-4(a)(1).  On information and belief, JPC expressly authorized ROSEN to make the defamatory statements described herein.

27.

On information and belief, ROSEN has made other media appearances in which he has repeated the defamatory statements in the Kendrick Johnson Articles that BRIAN and BRANDEN BELL murdered Kendrick Johnson, that the murder was covered up in a conspiracy in which the LCS, the GBI, the Valdosta Crime lab, and the entire Bell family cooperated to

keep the murder secret. Also on information and belief, these statements were directed or authorized by JPC.

## DEMAND FOR RETRACTION AND RESPONSE

28.

On April 18, 2014, counsel for the BELL Plaintiffs sent a letter to Defendants demanding a retraction of their libelous statements pursuant to O.C.G.A. §51-5-11. On May 19, 2014, Plaintiffs' counsel sent another letter to Defendants setting forth the specific retraction required by Plaintiffs.  True and correct copies of these letters are attached hereto and made a part hereof as Exhibits "B" (without Exhibit "A" attachment) and "C," respectively. They were received by both Defendants.

29.

JPC removed most of the Kendrick Johnson Articles from the Ebony website on May 5, 2014, but subsequently refused the written retraction demanded by the BELL Plaintiffs. ROSEN failed to respond at all to the initial BELL demand letter from Plaintiffs.

## CAUSES OF ACTION

COUNT ONE

LIBEL

30.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 29 of this Complaint as if fully set forth herein.

31.

A libel is a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt or ridicule.  O.C.G.A. § 51-5-1.

32.

False statements that one has committed criminal conduct amounting to a felony under Georgia law are libelous per se, that is, without the necessity of proving actual damages. Defendants have falsely accused BRIAN BELL of murder (as codified in O.C.G.A. § 16-5-1), BRANDEN BELL of being an accomplice or accessory to murder (as codified in O.C.G.A. § 16-2-20) if not also a murderer, and RICK AND KAREN BELL of conspiracy to cover up murder (as codified in O.C.G.A. §16-10-50), all of which are felonies under Georgia law.  Defendants have thus committed libel per se of

all Plaintiffs.

33.

A libelous charge is actionable per se whether the words directly or indirectly, by intimation or innuendo, or indirectly or by inference, contain libel.  It is the harmful effect of defamatory language as it is understood which renders it actionable per se, and not its directness or unequivocal nature.  In this case, though the Defendants employed pseudonyms in the Kendrick Johnson Articles to describe the Plaintiffs.  Students, faculty and coaches at LCHS could and did easily discern that the referenced LCHS football player who had a fight with Kendrick Johnson on a school bus was BRIAN BELL, and that his older brother was BRANDEN BELL, and that both of them were sons of FBI agent RICK BELL and his wife KAREN BELL.

34.

The statements in the Answers article which revised the theory of Kendrick Johnson's murder as being committed by BRIAN BELL with an unnamed accomplice, motivated by sexual jealousy, as well as the subsequent cover-up of the murder, constituted libel by innuendo of the Plaintiffs as much as the statements in the Tweets article, taken in context of all of the Kendrick Johnson Articles.

35.

The libelous statements were made and published in this case with actual malice, i.e., with actual knowledge by Defendants that they were false

or with reckless disregard of whether they were false. Such conduct amounts to negligence as well as reckless and wanton conduct.

36.

The libelous statements contained in the Kendrick Johnson Articles attached in Exhibit "A" hereto were published on the JPC web site www.ebony.com, as a result of JPC's sales of Ebony subscriptions in Georgia, including the Middle District of Georgia.  They were also published nationally and worldwide and have resulted in national media attention to the Plaintiffs as being involved in the alleged Kendrick Johnson murder and cover-up. The first article containing sufficient information to identify the BELLS was the Tweets article on November 23, 2013.

37.

At all times pertinent to this Complaint in investigating, writing and discussing the libelous statements of Plaintiffs in the KJ articles, ROSEN was acting as the authorized agent of JPC. JPC is thus responsible for his libelous conduct under the doctrines of respondeat superior or agency, and is also responsible for its own conduct in publishing the Kendrick Johnson Articles without any effort to verify the truth of the libelous allegations therein or with knowledge of the falsity of the allegations.

38.

All Plaintiffs have been permanently damaged and by Defendants' libel of their personal reputations, and RICK BELL has been injured in his

professional reputation as an FBI agent. Apart from special damages of each plaintiff that may be proven at trial, they are entitled to recover the sum of at least $3,000,000.00 in compensatory damages, or such additional sum as is determined appropriate by a fair and impartial jury in this case.

COUNT TWO

SLANDER

39.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 38 of this Complaint as if fully set forth herein.

40.

Slander or oral defamation consists, in pertinent part, of imputing to another a crime punishable by law… making charges against another in reference to his trade, office, or profession, calculated to injure him therein; or other uttering any disparaging words producing special damages which flows naturally therefrom.  O.C.G.A. § 51-5-4. The defamatory statements described herein made by Defendants have also been repeated and embellished orally by ROSEN  in radio and TV shows, some broadcast on the internet, as early as June of 2013.

41.

A slander is published as soon as it is communicated to any person other than the party slandered.  In this case, the slander was published on internet radio shows involving ROSEN between October 2013 and January

2014, and possibly thereafter. On information and belief, other shows involving explanations of the Ebony articles have taken place on local television and radio stations, and in conversations ROSEN has had with bloggers via e-mail, twitter, Facebook and other social media that has been repeated on numerous occasions by other persons.

42.

A party who commits slander or libel may be held responsible for repetition of same by others if such repetition or republication by others is a natural and probable consequence of the original slander.  In this case, Defendants knew that the false and defamatory statements they made about Plaintiff in a nationally-published magazine and via internet would be repeated by other persons.  Such additional defamation is the responsibility of Defendants as the natural and probable consequence of their original statements.

43.

The libelous statements were made and published in this case with actual malice, i.e., with actual knowledge by Defendants that they were false or with reckless disregard of whether they were false. Such conduct amounts to negligence as well as reckless and wanton conduct.

44.

At all times pertinent to this Complaint in investigating, writing and discussing the libelous statements about Plaintiffs in the Kendrick

Johnson Articles, ROSEN was acting as the authorized agent of JPC. ROSEN's slanderous comments were made at the direction of or with the express approval of JPC. JPC is thus responsible for his libelous conduct and is also responsible for its own conduct in publishing the Kendrick Johnson Articles without any effort to verify the truth of the libelous and allegations therein or with knowledge of the falsity of such statements.

45.

All Plaintiffs have been permanently damaged by Defendants' libel in both their personal reputations, and RICK BELL has been injured in his professional reputation as an FBI agent. Apart from special damages that may be proven at trial, they are entitled to recover the sum of at least $1,000,000.00 in compensatory damages, or such additional sum as is determined appropriate by the jury in this case.

COUNT THREE

PUNITIVE DAMAGES

46.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 45 of this Complaint as if fully set forth herein.

47.

Plaintiffs made demand for retractions by Defendants  pursuant to O.C.G.A. § 51-5-11(a) through their attorneys by letters sent by certified mail as alleged in Paragraphs 17 and 18 herein, allowing at least seven (7)

days for responses. Defendants have refused or failed to make the demanded retractions. As a result, the jury is authorized to award Plaintiffs punitive damages if proven as required by law.

48.

Punitive damages may be awarded in tort actions in which it is proven by clear and convincing evidence that the defendant's action shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.  Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, and deter a defendant.  O.C.G.A. § 51-12-5.1(b)(c).

49.

The conduct of Defendants in this case in publishing false statements of criminal conduct by Plaintiffs, with knowledge that such statements were untrue and extremely damaging to their reputations, or publishing these false statements with reckless disregard for their truthfulness, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences entitling Plaintiffs to recover an additional amount of punitive damages to be determined in the discretion of the jury to penalize or punish Defendants for such conduct and to deter such conduct in the future. Plaintiff seeks punitive damages of at least $1,000,000 and further avers that, by

clear and convincing evidence, Defendants acted with specific intent to harm Plaintiffs.

### COUNT FOUR

### EXPENSES OF LITIGATION

50.

Plaintiffs repeat and re-allege each of the allegations in Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.

Pursuant to O.C.G.A. § 13-6-11, Plaintiffs seek to recover, in the discretion of the jury, their expenses of litigation, including attorney's fees, on the basis that Defendants have acted in bad faith, been stubbornly litigious, or has caused Plaintiffs unnecessary trouble and expense.

52.

The amount of expenses of litigation at the time of trial shall be proven by appropriate documents and expert testimony as required by law.

### **JURY TRIAL DEMANDED**

Plaintiffs respectfully demand a jury trial in this action.

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

1.     An award of general and compensatory damages on Count One or of the Complaint for libel in the amount of $3,000,000.00 or more; and

2.     An award of general and compensatory damages on Count Two

or of the Complaint for slander in the amount of $1,000,000.00 or more; and

3.      An award of at least $1,000,000 in punitive damages on Count Three of the Complaint as determined in the discretion of the jury based upon the evidence produced at trial; and

4.      An award of expenses of litigation on Count Four of the Complaint, in the discretion of the jury, in an amount to be based upon the documentary and expert testimony at trial regarding said expenses; and

5.      Such other relief as is just and appropriate under the circumstances.

DATED this 16th day of February, 2016.

/s/M. Brice Ladson
**M. BRICE LADSON**
**Georgia Bar No. 431071**
**ATTORNEY FOR PLAINTIFFS**

**Ladson Law Firm, P.C.**
**10375 Ford Avenue, St. 3**
**P. O. Box 2819**
**Richmond Hill, Georgia 31324**
**mbrice@ladsonlaw.com**
**Tel:  (912)459-1118**

/s/ Patrick T. O'Connor
**PATRICK T. O'CONNOR**
**Georgia Bar No.  548425**
**PAUL H. THREKELD**
 **Georgia Bar No. 710731**
**LAUREN E. MEADOWS**
**Georgia Bar No. 575757**
**ATTORNEYS FOR PLAINTIFFS**

**OLIVER MANER LLP**
**218 West State Street**
**Savannah, GA  31401**
**Tel:  912-236-3311**
**pto@olivermaner.com**
**pht@olivermaner.com**
**lmeadows@olivermaner.com**