# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

**RICHARD E. BELL, JR., KAREN K. BELL, BRANDEN R. BELL, and BRIAN E. BELL,**

       Plaintiffs,

v.                                  Civil Action No. 7:16-CV-16 (HL)

**JOHNSON PUBLISHING COMPANY, LLC, a/k/a JOHNSON PUBLISHING COMPANY, INC.,**

       Defendant.

## ORDER

Before the Court is Defendant Johnson Publishing Company, LLC's Motion for Partial Judgment on the Pleadings (Doc. 34). Defendant moves the Court to dismiss the defamation claims of Plaintiffs Richard E. Bell, Jr. and Karen K. Bell (the "Bell Parents"). Defendant additionally moves to dismiss Plaintiffs' collective claim for punitive damages, alleging that Plaintiffs failed to follow the statutory requirements set forth in Georgia's retraction statute and thus are not entitled to the recovery of punitive damages. Upon review of the pleadings, and with the benefit of oral argument, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion. Also before the Court is Plaintiffs' Motion for Leave to

1

Amend Amended Complaint (Doc. 43). For the following reasons, Plaintiffs' motion is **DENIED**.

## I.   BACKGROUND

Around 1:30 p.m. on January 10, 2013, the body of Kendrick Johnson ("KJ"), a Sophomore at Lowndes County High School ("LCHS") in Valdosta, Georgia, was discovered in a standing gym mat in the school's old gym. Speculation abounded about how KJ came to be in the rolled-up mat, and media outlets began probing the developing story. Between August 12, 2013 and April 9, 2014, Defendant Johnson Publishing Company, LLC ("Johnson Publishing"), published a series of fifteen articles on their website Ebony.com pertaining to KJ's death and the ensuing investigation (the "KJ Articles" or "Articles"). Frederick A. Rosen ("Rosen"),[1] a writer known for his "true crime" publications, authored the majority of the articles. The initial five articles, published between August 12, 2013 and September 23, 2013, were entitled "Who Killed Kendrick Johnson." In these first articles, Rosen questions the integrity of the investigation into the cause of KJ's death, suggesting that KJ was murdered under suspicious circumstances and not the victim of an unfortunate accident as claimed by local law enforcement.

---

[1] Rosen was dismissed as a party to this lawsuit on March 8, 2017.

On September 4, 2013, Rosen first reports about a student by the name of "Sean Marshal," who allegedly was involved in an altercation with KJ on a school bus traveling to an away football game several months prior to KJ's death. (Doc. 31-1, p. 23). Sean Marshal is a pseudonym that Rosen later changed to "Clark Martin" in his October 25, 2013 article "Did a Fight Lead to Kendrick Johnson's Murder?" (Id. at p. 36). The article describes Clark Martin as a white male who was a Senior at LCHS. (Id. at p. 36). According to the article, detectives following up on the story about the altercation between KJ and Clark Martin contacted "Sam Martin," Clark's father, and requested an interview:

> When Adams did, the father, Sam Martin, referred him to his attorney, who would not permit any interviews at that time. However, two weeks later on January 31, Det. John Marion followed up and contacted one of Martin's parents and was able to go to their house and speak to the teen.

(Id.). Clark reportedly told the investigators during this meeting that he did not know KJ and that on the day of KJ's death he was in the weight room and not in the old gym. (Id. at p. 37). The Martins' younger son Chris, a Sophomore at LCHS, was present during the interview of Clark. (Id.). The detectives sought and obtained permission from the parents, Sam and Susan Martin, to speak with Chris as well. (Id.). Chris told the detectives that he had observed both KJ and other students throwing their shoes over the gym mats, which they would retrieve the next day to play basketball. (Id.). On March 21, 2013, the Lowndes County Sheriff's Department ("LCSO") contacted the Martin's attorney about Clark and

Chris Martin providing a formal statement to police. (Id.). The attorney, after consulting with Sam Martin, informed the LCSO that the two young men would not be meeting with investigators. (Id.).

In this same article, Rosen reports that in April 2013, investigators interviewed another student who stated that it was Chris and not Clark Martin who got into a fight with KJ on the school bus. (Id. at p. 38). Chevene King, an attorney of KJ's parents, also purportedly stated during a radio interview that following the altercation Sam Martin invited KJ to his home for a rematch. (Id.).

While the alleged fight between KJ and Chris Martin remained as a central feature in Rosen's investigation into what led to KJ's death, any further mention of the Martin parents in the remaining articles is sparse. Rosen recaps the majority of the events described in his October 25 article in his November 19, 2013 article "Tweets from Possible Suspects Raise Eyebrows" (the "Tweets" article). (Id. at p. 40-44). However, in this article Rosen also notes that Beau Webster, a private investigator hired by KJ's family, specifically identified Clark and Chris Martin as possible suspects for the murder of KJ. (Id. at p. 41). According to the article, Webster additionally identified other alleged suspects and stated that they were under investigation by the Federal Bureau of Investigation. (Id.). Webster apparently also discovered that Chris Martin and KJ fought a second time. (Id.). This discovery is what led investigators to approach Sam Martin for permission to interview Chris. (Id.). Rosen then states, "We have

4

been able to confirm that the elder Martin is an FBI agent. He refused to have his son interviewed by the sheriff's detectives, instead referring them to his attorney." (Id. at 41-42). The "Tweets" article goes into more detail about what transpired during the investigator's January 31, 2013 meeting with the Martin family, again stating that the detectives obtained permission from either Sam or Susan Martin to speak with the boys. (Id. p. 42). However, neither the "Tweets" article nor any of Rosen's subsequent submissions to Ebony.com describe any further involvement of Sam or Susan Martin.

On April 18, 2014, Plaintiffs' counsel sent Johnson Publishing a letter entitled "Demand for Retraction and Payment of Unliquidated Damages." (Doc. 31-2). The letter demands the following pursuant to O.C.G.A. § 51-5-11:

> within fourteen (14) days of the receipt of this letter, [Johnson Publishing] issue a written retraction to the national media of the statements you have made that the sons of the FBI agent identified in your articles were involved at all in the death of KJ or any possible cover-up of the death. You must retract any claim that their father, or any member of the Bell family, was part of the alleged cover-up of KJ's murder. If you agree to make a retraction, we will furnish you with a specific retraction statement acceptable to the Bells.

(Doc. 31-2, p. 11-12). Plaintiffs further demand that Johnson Publishing pay $1.5 million in compensatory damages within thirty (30) days of receiving the letter. (Id. at p. 12).

Plaintiffs' counsel sent a second letter to Johnson Publishing dated May 19, 2014, entitled "For Settlement and Retraction Purposes Only." (Doc. 31-3).

This letter sets forth the retraction notice Plaintiffs required Johnson Publishing issue, to "be released to all U.S. print and broadcast media, as well as web media or others linked to any Johnson web site." (Id. at p. 1). The letter further specifies Plaintiffs' requirement that the retraction notice "be written in Ebony Magazine and posted on the Ebony website for a period of one year so that any person attempting to access any Ebony articles about KJ . . . will see this retraction." (Id. at p. 2). The letter set a deadline of May 21, 2014 for Johnson Publishing to issue the retraction. (Id. at p. 4).

Johnson Publishing removed the majority of the KJ articles from Ebony.com on May 5, 2014. (Doc. 31, ¶ 26). However, Johnson Publishing refused to publish the written retraction demanded by the Bell Parents. (Id.).

## II.   LEGAL STANDARD

A motion for judgment on the pleadings is properly filed "[a]fter the pleadings are closed[,] but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998) (internal citations omitted); Cunningham v. Dist. Att'y's Office for Escambia Cty., 592 F.3d 1237, 1255 (11th Cir. 2010). In deciding a motion for judgment on the pleadings, the facts in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party.

6

Id. The court may consider documents attached to the pleadings. <u>Horsely v. Feldt</u>, 304 F.3d 1125, 1134 (11th Cir. 2002).

A Rule 12(c) motion for judgment on the pleadings is governed by the same standards as a Rule 12(b)(6) motion to dismiss. <u>Strategic Income Fund, LLC v. Spear, Leeds & Kellog Corp.</u>, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002) (explaining that the standard for either a Rule 12(b)(6) or Rule 12(c) motion is "whether the count state[s] a claim for relief"). The complaint must contain sufficient factual information to state a claim for relief that is "plausible on its face." <u>Wooten v. Quicken Loans, Inc.</u>, 626 F.3d 1187, 1196 (11th Cir. 2010). When the plaintiff provides enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the complaint is "plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "Labels and conclusions" and a "formulaic recitation of the elements of a cause of action" are insufficient to raise a right to belief above the "speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

## III.    DISCUSSION

Defendant argues that it is entitled to judgment on the pleadings because none of the statements contained within any of the KJ Articles that potentially reference the Bell Parents is libelous as a matter of law. Georgia law defines libel as "a false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him

to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). "To succeed in a libel action, a plaintiff must prove that the defendant published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered actual injury from the statement." Bryant v. Cox Enterprises, Inc., 311 Ga. App. 230, 234 (2011) (quoting Mathis v. Cannon, 276 Ga. 16, 21(2) (2002)) (internal quotation marks omitted).

### A.   Libel Claims

#### 1.   "Of and Concerning"

To sustain an action for libel, there is no requirement that the defamatory statement refer directly to the plaintiff; however,

> the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before.

Armscorp of Am. v. Daugherty, 191 Ga. App. 19 (1989) (internal quotation marks and citation omitted) (alterations adopted). The plaintiff bears the burden of showing that "the publication was about the plaintiff, that is, whether it was of and concerning her as a matter of identity." Smith v. Stewart, 291 Ga. App. 86, 92 (2008) (quotation marks and citation omitted). "The test is whether persons who knew or knew of the plaintiff could reasonably have understood that" the allegedly defamatory statement refers to the plaintiff. Id. "It is not necessary that

8

all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that she is the person meant." Id. (alterations adopted).

The Court concludes that the KJ Articles contain sufficient identifying information about the Bell Parents for persons who knew or knew of them to conclude that the individuals identified as "Sam" and "Susan Martin" are actually Richard and Karen Bell. Defendants have not argued to the contrary. Accordingly, the Court finds that Plaintiffs have met their initial burden of establishing that the Articles are, in part, about them.

## 2. Libel Per Se

A written defamatory statement may be actionable either as libel per se or libel per quod. Zarach v. Atlanta Claims Ass'n, 231 Ga. App. 685, 688 (1998) (citing Macon Telegraph Pub. Co. v. Elliott, 165 Ga. App. 719, 723(5) (1983)).

> Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality. Statements that tend to injure one in his trade or business also are libelous per se. When determining whether words are defamatory as a matter of law, courts may not hunt for strained constructions and must rely upon the words themselves in considering whether a statement was defamatory per se. Defamatory words which are actionable per se are those which are recognized as injurious on their face – without the aid of extrinsic proof.

Id. (internal quotation marks and citations omitted).

"The law is abundantly clear in Georgia – words that are libelous per se do not need innuendo." Id.; see also Cottrell v. Smith, 299 Ga. 517, 523(II)(A), (2016) (words that require extrinsic proof to show their defamatory nature are not

libel per se). "A publication that is claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." <u>Collins v. Creative Loafing Savannah, Inc.</u>, 264 Ga. App. 675, 679 (2003). Thus, "the whole item should be read and construed together, and . . . if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not." <u>Fiske v. Stockton</u>, 171 Ga. App. 601, 602(1) (1984). "Where a statement is defamatory per se, the element of damages is inferred. <u>Smith v. DiFrancesco</u>, 341 Ga. App. 786, 789 (2017) (citing <u>Strange v. Henderson</u>, 223 Ga. App. 218, 219 (1996)).

The Bell Parents allege that the KJ Articles falsely accuse them of conspiracy to cover up the murder of Kendrick Johnson. Under O.C.G.A. § 16-10-50, a person commits the crime of "hindering the apprehension of a criminal when, with intention to hinder the apprehension or punishment of a person whom he knows or has reasonable grounds to believe has committed a felony or to be an escaped prisoner, he: (1) [h]arbors or conceals such a person; or (2) [c]onceals or destroys evidence of the crime." The plain language of the Articles makes no such claim against the Bell Parents.

The Articles themselves say very little about the Bell Parents and certainly never specifically state that they were involved in any type of purported criminal conspiracy. Defendant published Rosen's first article in the series on August 12,

10

2013. (Doc. 31-1, p. 2-6). There is no reference to the Bell Parents until the sixth article, "Did a Fight Lead to Kendrick Johnson's Murder?", which appeared on October 25, 2013. (Id. at p. 35-39). In that article, it was reported that when investigators first contacted the father of a young man believed to have been involved in an altercation with KJ several months prior to KJ's death, the father initially declined permission for law enforcement to meet with his son, instead referring the investigators to the family's attorney. (Id. at p. 36). Two weeks later on January 31, 2013, when the detective contacted the parents again, the detective was invited to the home to speak with the young man. (Id.). During the interview with the one teenage boy, the investigator sought and obtained permission to speak with the younger son as well. (Id. at p. 37). According to this same article, on March 21, 2013, law enforcement, interested in obtaining a formal statement from the two boys, spoke with the family attorney, who advised that there would be no further meetings with investigators. (Id.).

The "Tweets" article, which appeared on Ebony.com on November 19, 2013, again describes investigators' meeting with Sam and Susan Martin and their two sons, Clark and Chris, reiterating that the parents initially referred law enforcement agents to their family attorney but later consented to meet with investigators in their home. (Id. at p. 41-42). This article also identifies Sam Martin as an FBI agent. (Id. at p. 41). Neither the Court nor the parties have

identified any additional statements that reference the Martin parents, a pseudonym for the Bell Parents.[2]

The Articles describe no criminal conduct by the Bell Parents. As the parents of Branden and Brian, who were both minors at the time, the Bell Parents were well within their rights either to grant or to decline interviews with their children. Their decision to limit their sons' contact with law enforcement was not criminal, nor does it constitute either harboring or concealing a criminal or concealing or destroying evidence of a crime as required under O.C.G.A. § 16-10-50. In order for the Court to accept Plaintiffs' argument that the Bell Parents by declining further interviews somehow knew that KJ had been murdered and engaged in an overall conspiracy to prevent the apprehension of Kendrick Johnson's suspected murderer, the Court would have to read a great deal into the plain statements of the Articles and would require the imputation of innuendo, which the court may not consider when determining whether a writing is defamatory as a matter of law. Zarach, 231 Ga. App. at 689 (citing Willis v. United Family Life Ins., 226 Ga. App. 661, 662 (1997)).[3] Relying on the

---

[2] At the hearing held on October 11, 2017, the Court went through each of the statements identified by Defendant as referring to the Bell Parents. The Court then asked Plaintiffs' counsel to explain how each statement was libelous per se and to identify any additional statements Plaintiffs claim libeled the Bell Parents. Plaintiffs' counsel pointed to no additional statements within the Articles.

[3] Plaintiffs misstate the law regarding the consideration of rumor and innuendo when determining whether a statement is libelous per se. Citing to Southern Co. v. Hamburg, 220 Ga. App. 834, 838-39 (1996), Plaintiffs suggest that the use of

12

unambiguous language in the Articles, the Court finds that the statements contained in the KJ Articles pertaining to the Bell Parents are not libel per se as a matter of law.

Plaintiff Rick Bell additionally argues that he was libeled per se because the Articles injured him in his business as an FBI agent. The November 19, 2013 "Tweets" article does identify "Sam Martin" as an FBI agent. However, neither the "Tweets" article nor any of the other KJ articles ever states that Martin's position as an FBI agent had any bearing on his parental decision to limit his sons' contact with law enforcement. Any allegation that Rick Bell abused his authority as an FBI agent, again, would require the impermissible reliance on implication or innuendo.

### 3. Libel Per Quod

"[I]f the defamatory character of the words does not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo." <u>Zarach</u>, 231 Ga. App. at 688 (citation and punctuation omitted). "An essential element of an action for libel per quod is that the plaintiff be able to show special damages." <u>Zarach</u>, 231 Ga.

---

innuendo is not prohibited under Georgia law. A closer reading of the passage relied upon by Plaintiff, however, reemphasizes that when a publication's "meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not." <u>Id.</u> It is only where the statement is subject to multiple interpretations that a jury then may take into consideration "all the circumstances surrounding its publication, including extraneous facts admissible in evidence." <u>Id.</u>

App. at 698 (citing <u>Jamison v. First Ga. Bank</u>, 193 Ga. App. 219, 222(3) (1989)). These special damages "must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value." <u>Id.</u> (internal quotation marks omitted). A heightened pleading standard applies to special damages, which must be specifically stated. Fed. R. Civ. P. 9(g); <u>see</u> <u>Ballemead, LLC v. Stoker</u>, 280 Ga. 635, 639 (2006).

The Bell Parents' claim of libel per quod fails as a matter of law because they did not plead special damages with specificity in their Amended Complaint. In their response to Defendant's motion, Plaintiffs do not address the absence of a claim for special damages: "Since Defendant's statements constitute libel per se, it is unnecessary to address Defendant's argument that Plaintiffs failed to plead special damages." (Doc. 37, p. 12). Johnson Publishing accordingly is entitled to judgment on the pleadings with respect to the Bell Parents libel per quod claims.

## B.  Punitive Damages

Defendant moves the Court to dismiss Plaintiffs' claim for punitive damages, arguing that Plaintiffs' retraction request did not comply with Georgia's retraction statute. Under O.C.G.A. § 51-5-11,

> [i]n any civil action for libel which charges the publication of an erroneous statement alleged to be libelous, it shall be relevant and competent evidence for either party to prove that the plaintiff requested retraction in writing at least seven days prior

14

> to the filing of the action or omitted to request retraction in this
> manner.

O.C.G.A. § 51-5-11(a). The statute further provides that a plaintiff shall not be entitled to punitive damages, and the defendant shall only be liable to pay actual damages where: (1) the allegedly libelous statement was published without malice; the defendant within seven days of receiving the demand for retraction publishes a correction or retraction in a conspicuous manner; and, if requested by the plaintiff, the defendant additionally publishes an editorial repudiating the allegedly libelous statement; or (2) the plaintiff does not make a written request for correction and retraction. O.C.G.A. § 51-1-11(b) and (c).

It is undisputed that Plaintiffs sent Defendant a written retraction demand. Plaintiffs' April 18, 2014 letter to Defendant made the following demand:

> We demand that, pursuant to O.C.G.A. § 51-1-11, within fourteen (14) days of receipt of this letter, you issue a written retraction to the national media of the statement you have made that the sons of the FBI agent identified in your articles were involved at all in the death of KJ or any possible cover-up of the death. You must retract any claim that their father, or any member of the Bell family, was part of the alleged cover-up of KJ's murder. If you agree to make a retraction, we will furnish you with a specific retraction statement acceptable to the Bells.

(Doc. 31-2, p. 11-12). Plaintiffs additionally demanded compensatory damages in the amount of $1.5 million.

Then, on May 19, 2014, Plaintiffs provided Defendant with the specific statement Plaintiffs wished for Defendants to publish, which included a statement

of admitted liability and required that the retraction "be released to all U.S. print and broadcast media, as well as web media or others linked to any Johnson web site." (Doc. 31-3, p. 1). The letter further demanded that the "[r]etraction be written in Ebony Magazine and posted on the Ebony website for a period of one year so that any person attempting to access any Ebony articles about KJ, or making a web or other inquiry about KJ or the Ebony/Rosen articles (which shall not be re-published by Johnson or elsewhere with Johnson's permission), on the Ebony website or its Twitter, Facebook and e-mail accounts, will see this retraction." (Id. at p. 9).

Defendant argues that Plaintiffs are not entitled to recover punitive damages because the content of their retraction demand exceeds the basic provisions of the statute and includes burdensome conditions. The plain language of the retraction statute provides that as a precondition to the recovery of punitive damages a libel plaintiff first must "request a correction or retraction before filing their civil action against any person for publishing a false, defamatory statement." Mathis v. Cannon, 276 Fa. 16, 28 (2002) (finding that the plaintiff was not entitled to recover punitive damages where he asked an Internet provider to delete several posts made by the defendant but did not request in writing before filing his complaint that the defendant correct or retract any of his statements). However, other that setting forth the timeline for when the retraction notice must be provided, the statute does not place any limitations on the

contents of the notice. The statute also does not require that the defendant meet any particularized demand made by the plaintiff to avoid payment of punitive damages, explaining that a plaintiff shall not be entitled to pay punitive damages where the defendant provides proof:

> (A)    That the matter alleged to have been published and to be libelous was published without malice;
> (B)    That the defendant, in a regular issue of the newspaper or other publication in question, within seven days after receiving written demand, or in the next regular issue of the newspaper or other publication following receipt of the demand if the next regular issue was not published within seven days after receiving the demand, corrected and retracted the allegedly libelous statement in as conspicuous and public a manner as that which the alleged libelous statement was published; and
> (C)    That, if the plaintiff so requested, the retraction and correction were accompanied, in the same issue, by an editorial in which the allegedly libelous statement was specifically repudiated.

O.C.G.A. § 51-5-11(b)(1).

Finding that Plaintiffs' satisfied the statutory precondition that they first issue a demand for retraction prior to pursuing punitive damages, the Court denies Defendant's motion to dismiss Plaintiffs' claim for punitive damages. Whether or not Plaintiffs shall be entitled to recover punitive damages shall be a matter for the jury to determine.

## C.    Plaintiffs' Motion to Amend Amended Complaint

On August 27, 2014, Plaintiffs filed their initial complaint for libel and slander against Defendant in the Southern District of Georgia's Brunswick

Division. Defendant filed a pre-answer motion to dismiss or, in the alternative, motion for more definite statement on October 27, 2014. Defendant's motion specifically challenged the sufficiency of Plaintiffs' libel per se claims and argued that any potential claim by the Bell Parents for libel per quod failed as a matter of law because those Plaintiffs failed to plead special damages. Plaintiffs filed an amended complaint on November 13, 2014, which Defendant again moved to dismiss, in part based on the allegation that the Bell Parents had not pled special damages and, therefore, could not pursue a libel per quod claim. The case was transferred to this Court on September 22, 2015. Plaintiffs filed their notice of voluntary dismissal on September 23, 2015.

Plaintiffs refiled their claims against Defendant in this Court on February 16, 2016. Again, Plaintiffs neglected to include allegations of special damages, stating only the following:

> All Plaintiffs have been permanently damaged by Defendants' libel in both their personal reputations, and RICK BELL has been injured in his professional reputation as an FBI agent. Apart from special damages that may be proven at trial, they are entitled to recover the sum of at least $1,000,000.00 in compensatory damages, or such additional sum as is determined appropriate by the jury in this case.

(Doc. 1, ¶ 45). On March 28, 2017, after agreeing to dismiss Frederick Rosen as a defendant for jurisdiction reasons, Plaintiffs filed their fourth complaint. (Doc. 31). Plaintiffs' Amended Complaint included no additional allegations of special

damages. Defendant raised the failure to plead special damages as a defense in its Answer (Doc. 33, p. 33) and, on May 12, 2017, moved for judgment on the pleadings, arguing again that the Bell Parents' libel per quod claims fail as a matter of law because they failed to plead special damages. (Doc. 34).

Two months later, on July 13, 2017, Plaintiffs filed the present motion to amend their amended complaint. (Doc. 43). Plaintiffs seek permission to file what would be their fifth complaint to finally include allegations of purported special damages. Plaintiffs' request comes far too late.

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). However, leave to amend shall be freely given "when justice so requires." Id. "[U]nless a substantial reason exists to deny leave to amend, the discretion of the District Court is not broad enough to permit denial." Shipner v. Eastern Air Lines, Inc., 868 F.2d 401, 407 (11th Cir. 1989). Certain factors justify the denial of a motion to amend, including undue prejudice to the opposing party, undue delay, bad faith, repeated failure to cure deficiencies by previous amendments, or futility of the amendment. Foman v. Davis, 371 U.S. 178, 182 (1962); Laurie v. Ala. Ct. of Crim. App., 256 F.3d 1266, 1274 (11th Cir. 2001).

Discovery in this case has been stayed since March 2017 as a result of the inordinate amount of time required by the Department of Justice and the FBI to

produce documents relevant to the resolution of this case. (Doc. 26). The Court and the parties have remained in regular contact about the production of these documents, and the Court has intervened as it is able to help push the process along. Nevertheless, it is apparent that this case is far from conclusion, and additional discovery will need to be conducted once the Government finally produces the documents requested by the parties. But the fact that there is still time to engage in discovery does not, in the Court's opinion, absolve Plaintiffs of their repeated failure to cure the deficiency in their pleadings.

Plaintiffs have been on notice of the pleading deficiency since October 2014. They have now filed four complaints and still have not included allegations of special damages. Nor have Plaintiffs offered any explanation for their repeated failure to cure the shortcomings of their pleadings. In fact, Plaintiffs in their response to Defendant's motion for judgment on the pleading outright refused to address the absence of special damages, stating that "it is unnecessary to address Defendant's argument that Plaintiff's failed to plead special damages." (Doc. 37, p. 12 n.5).

While the passage of time certainly factors into the Court's consideration of Plaintiffs' motion to amend, ultimately, the Court denies Plaintiffs' motion based on Plaintiffs repeated failure to cure a known deficiency. Plaintiffs have been on notice for some time that their complaint was noticeably devoid of claims for special damages. And, despite having ample opportunity to plead special

damages with sufficient particularly, Plaintiffs still did not. Plaintiffs' Motion for Leave to Amend Amended Complaint (Doc. 43) is, therefore, **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Judgment on the Pleadings (Doc. 34). The Court grants Defendant's motion to dismiss Plaintiffs Richard E. Bell, Jr. and Karen K. Bell as parties to this lawsuit. However, the Court denies Defendant's motion to dismiss the remaining Plaintiffs' claim for punitive damages. The Court **DENIES** Plaintiffs' Motion for Leave to Amend Amended Complaint (Doc. 43).

**SO ORDERED** this 10th day of January, 2018.

_**s/ Hugh Lawson**_____
**HUGH LAWSON, SENIOR JUDGE**

aks